UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CASE NO. 3:06CR161(EBB) |
| | : | |
| V. | : | |
| | : | |
| JAMES E. GALANTE, ET AL. | : | AUGUST 21, 2008 |

MEMORANDUM IN AID OF SENTENCING THE DEFENDANT, JAMES GALANTE

  The defendant, James Galante, by and through his counsel, respectfully submits this

Memorandum in Aid of Sentencing to set forth the factors that this defendant respectfully

submits the Court should consider in determining a sentence that is sufficient, but not greater

than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

**I. Background**

  On June 8, 2006, a grand jury returned an Indictment under seal against James Galante

and thirty-eight additional individual and corporate defendants.  The Indictment contained one

hundred and seventeen (117) counts based on allegations of Racketeering, Racketeering

Conspiracy, Hobbs Act Extortion, Mail and Wire Fraud, Attempt and Conspiracy to Commit

Mail and Wire Fraud, Witness Tampering Misuse of a Computer, Interference with Electronic

Surveillance, Conspiracy, False Statement on Tax Filing, Aiding or Assisting False Return and

Criminal Forfeiture. A Superseding Indictment containing 108 counts was returned on June 12, 2007.

On June 3, 2008, James Galante entered into a Plea Agreement with the government, pursuant to which he pleaded guilty to three of the one hundred and eight counts contained in the Superseding Indictment; specifically, Counts 2, 75 and 81. Count 2 charged Mr. Galante and others with Racketeering Conspiracy in violation of Title 18 U.S.C. § 1962 (d). Count 75 charged a conspiracy to commit wire fraud in violation of 18 U.S.C. § 1349 and Count 81 charged a conspiracy to defraud the United States Internal Revenue Service in violation of 18 U.S.C. § 371. Counts 2 and 75 each carry a maximum term of 20 years imprisonment and Count 81 carries a maximum penalty of 5 years imprisonment. Each of the three counts of conviction also allows for the imposition of a fine, not to exceed $250,000 on each count, and a term of supervised release of not more than three years.

In connection with his guilty plea, Mr. Galante also agreed to and did forfeit his interest in twenty-five companies, the total value of which is in excess of $100 million dollars. Moreover, he forfeited his interests in certain tangible property, more fully described on pages 5 and 6 of his plea agreement. Mr. Galante also agreed to pay to the IRS certain taxes, penalties and interest owed to the United States and to cooperate fully with federal and state civil tax

authorities an obligation he fulfilled within days of his allocation.  Finally, Mr. Galante agreed to immediately and permanently withdraw from the trash industry.

## II.      Sentencing Guidelines and Section 3553 Factors

### A.      Sentencing Post-<u>Booker</u>

As a result of the United States Supreme Court's holding in <u>United States v. Booker</u>, 125 S. Ct. 738 (2005), the United States Sentencing Guidelines ("Guidelines") are now "effectively advisory." <u>Id</u>. at 757.   The <u>Booker</u> Court held that the Sentencing Reform Act "requires a sentencing court to consider Guidelines ranges, see 18 U.S.C.A § 3553(a)(4) (Supp. 2004), but it permits the court to tailor the sentence in light of other statutory concerns as well, see § 3553(a) (Supp. 2004)." <u>Booker</u>, supra, at 757.  Thus, under <u>Booker</u>, sentencing courts must treat the Guidelines as just one of a number of sentencing factors set forth in section 3553(a).

Section 3553(a) directs the court to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth" in that statute.  18 U.S.C. § 3553(a).

Section 3553(a) further provides, in pertinent part, that:

The court, in determining the particular sentence to be imposed, shall consider –

(1)    the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)    the need for the sentence imposed-

       (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

       (B)     to afford adequate deterrence to criminal conduct;

       (C)     to protect the public from further crimes of the defendant; and

       (D)     to provide the defendant with needed educational or vocational training, medical care  or other correctional treatment in the most effective manner;

Clearly, sentencing courts now have the ability to impose sentences that are tailored to the particular facts and circumstances of a given case and are no longer expected to uncritically apply the Guidelines.  To do the latter would be "inconsistent with the holdings of the merits majority in Booker, rejecting mandatory guideline sentences based on judicial fact-finding, and the remedial majority in Booker, directing courts to consider all of the § 3353(a) factors, many of which the guidelines either reject or ignore." United States v. Ranum, 353 F. Supp. 2d 984, 985-86 (E.D. Wisc. 2005).

Thus, in every case, a sentencing court must now consider all of the section 3553(a) factors, as well as the Guidelines, in determining a sentence that is sufficient but not greater than necessary to meet the purpose of sentencing.

### III.   Determining the Appropriate Sentence in This Case

#### A.   Nature and Circumstances of the Offense

As set forth above, on June 3, 2008, Mr. Galante pleaded guilty to Racketeering

Conspiracy, Conspiracy to Commit Wire Fraud and Conspiracy to Defraud the IRS.   In

connection with his guilty plea to the Racketeering Conspiracy in Count Two, Mr. Galante

admitted and acknowledged that he was involved in an attempt to "fix" a bid so that a co-

conspirator, Allan Ferraro, would be permitted to retain control of a transfer station.   In order to

ensure that the contract went to Ferraro's company, Tri-County Disposal, Mr. Galante and/or

others at his direction falsely instructed potential competitors that Tri-County was one of

Galante's companies and that Galante wanted the contract.   This maneuver was ultimately

unsuccessful as the contract in fact went to another bidder.   Mr. Galante also admitted that he

was involved in witness tampering in or around the summer of 2005, following the execution of

search warrants on his businesses and residence.

With respect to Count Eighty-One, Conspiracy to Defraud the IRS, Mr. Galante admitted

that false expense reports were filed by some of his companies; a number of no-show employees

were placed on the payroll of some of his companies; that 530 Main Street North was a shell

company that existed only to own a residence and absorb expenses in connection with that which

were in turn deducted as business expenses; that cash was provided to Mr. Galante either through skims or kickbacks; and that money was not reported as income on his tax returns.  In connection with his plea of guilty to Count 75, Mr. Galante admitted that he participated in wire fraud by exceeding the salary caps in place by the United Hockey League ("UHL") and in turn causing false reports to be faxed to the UHL that underreported players' salaries.

### B.     History and Characteristics of James Galante

#### 1. Personal and Familial History

James Galante is the oldest of six children born to his parents, Anthony and Catherine Galante.  His mother, an avid smoker, died from lung cancer at the age of sixty-four.  His father, who has always suffered from epilepsy, is suffering also from prostate and bone cancer.

He has three brothers, Anthony ("Tony"), Stephen and Vincent ("Vinny"), as well as two sisters, Margaret ("Peg") and Catherine ("Cathy").   Mr. Galante and his siblings grew up in New York, first living in the Bronx and then South Salem.  His father was a milkman and owned his own, small garbage collection business.  His mother stayed at home to take care of the children.

Mr. Galante's father worked hard, typically leaving the house by 2:00 a.m. every morning to make his milk deliveries, only to return to get his truck so he could embark on collecting trash.   When Mr. Galante was approximately 9 years old, he started assisting his

father in his trash company.   His father instilled in him the strong work ethic he has always exhibited.

A desire to serve his country, combined with the incentive to move out of his parents' house, motivated Mr. Galante to enlist in military service when he was 18 years old.   He served in the United States Air Force for four years.   Following an honorable discharge, he returned to his hometown and went to work for Thomas Milo, the man who had purchased Anthony Galante's garbage business just a few years earlier.   For approximately one year, Mr. Galante worked 60-70 hours a week for Milo.   When his request for a small raise was denied, he sold his car, bought a truck, and opened his first business, Countywide Carting.   He was 22 years old.   Mr. Galante describes the trash collection business as tough and competitive.   Nonetheless, he persisted and his business continued to grow.

When he was 22 years old, he also met Roseanne DiNardo at a laundromat.   Within the year, the two were engaged and then married.   Once married, Mr. Galante continued to work slavishly to develop and expand his business while Roseanne continued her job as a receptionist at a brokerage firm where she ultimately earned a stockbroker's license.   They elected to wait to have children until they were in a position to properly care and provide for them.   Thus, was not until eleven years after marrying that they had their first child, Anthony James ("A.J.").   Four years later, their daughter, Candace, was born.

Mr. Galante was determined to provide his family a better life than the one he had growing up. He and Roseanne made a conscious effort to provide their children a safe, loving environment in which to grow up. Mr. Galante made sure to kiss and hug each of his children every day -- a practice he continues to this day. Although he worked long hours to cultivate his businesses, usually leaving the house by 5:00 a.m., he was home every night (with rare exception) to eat dinner with his family. He attended all of his children's sporting events, dance recitals and school events. By all accounts, his is extremely close with his children. A.J. graduated from Manhattanville College in May 2008 and is now working for one of the companies formerly owned by his father. Candace is starting college this fall at Quinnipiac University.

Since being placed on home confinement 26 months ago, Mr. Galante has taken over the running of the household while his wife returned to work. Roseanne states that even though it has not been easy for either one of them, her husband has been "awesome." As the Court is aware from the PSR and otherwise, Roseanne Galante suffers from a medical condition. Her condition has and is expected to continue to deteriorate.

It is without question that Mr. Galante has always been a hard and dedicated worker, but for the last fifteen years or so he has also enjoyed a life of relative luxury. Mr. Galante candidly

admits that with his business success came not only the desire but also the ability have all of the things he never had growing up. He developed a penchant for nice things.

But Mr. Galante, unlike many others who have violated the law, also gave back.[1] The charitable works and donations made by Mr. Galante and his wife Roseanne are staggering. Roseanne reveals that her husband will see a story of tragedy in the paper or on the news and then take steps to lend a hand, often through substantial financial assistance. The Galantes have donated more than $3,000,000 and countless hours of their time over the last decade to a variety of charities, civic organizations and causes. For example, they are responsible for the new football and baseball stadiums at New Fairfield High School, the new pediatric suite at Danbury Hospital and the creation and funding of a non-profit organization that gives grants to military families in need of financial assistance. The Galantes have made substantial donations to the American Red Cross, Newton Community Fund, C.A.R.D Foundation, Boy Scouts of America, March of Dimes, St. Edward the Confessor Parish, American Cancer Society, Make-A-Wish Foundation, New Fairfield Fire Department and dozens of other charities and organizations. In addition, James and Roseanne Galante personally touched the lives of their neighbors, friends and strangers alike, through their philanthropic and altruistic spirit. In an effort to illustrate the

---

[1] Indeed, this comparison should not even be limited to those who have violated the law.

extent of their generosity, just some of Mr. Galante's civic and charitable work is discussed in greater detail below.

New Fairfield High School Athletics

Mr. Galante donated approximately $2,000,000 to New Fairfield High School athletics between 2002 and 2004. He completely funded and oversaw the construction of New Fairfield High School's new football stadium and baseball stadium. Mr. Galante also purchased new uniforms for every New Fairfield High School athletic team, including the hockey, softball, baseball and basketball teams. In addition, he helped finance the renovation of the school's baseball field. Finally, Mr. Galante created a fund to offset the school's pay-for-play policy, allowing students who could not otherwise afford to do so participate in sports.[2]

Homeland Aid and Assistance, Inc.

In 2003, after seeing a news report concerning the financial hardships faced by military families, the Galantes created Homeland Aid and Assistance, Inc. Funded with an initial contribution of $200,000, of which $100,000 was donated by Mr. Galante personally, Homeland Aid has two grant programs. Assistance grants are used to provide military families with money to pay household bills and expenses. Memoriam grants are used to honor fallen soldiers by

---

[2] Examples of "thank you letters" to Mr. Galante and newspaper articles detailing his donations to New Fairfield High School athletics are contained in Attachment 1.

making donations to various charities and organizations in their names.[3]

To date, the families of more than two dozen Connecticut soldiers killed in the line of duty in Iraq or Afghanistan have received grants of $5000.00 each. Many of those families have in turn used that money to create scholarships or endowments in memory of the fallen soldier.

Excerpts from just some of the more touching thank you letters the Galantes received as a result of their work and contributions include:

Dear Roseanne and Jim Galante,

The words "thank you" do not sufficiently convey our appreciation for your support of our Marines of the 1st Truck Platoon, New Haven, Connecticut. When I tell the story of Homeland Aid and Assistance, people are incredulous at your generosity and your resolve to help those in the military who serve our country with honor, courage and commitment.

Warmest regards,

Diane Devalt
[United States Marine Corps]

* * *

I want to thank you for your very generous donation to the Jason Lewis Memorial Fund. As parents, Jason and I often spoke about the future education of our children, Max, Jack and Grace. Your Contribution will be held for their education. I am still trying to come to terms with the loss of Jason, but my worries are not as great due to your kindness and generosity.

---

[3] Examples of newspaper articles and letters concerning Homeland Aid, including one from J. Allen Kosowsky describing the program, are contained in Attachment 2.

◇

* * *

On behalf of the Fallen Heroes Last Wish Foundation, I want to thank you for your generous contribution of $5,000. Your Contribution will be used to support the mission of the Foundation, to provide financial support to the children of the United States military personnel killed in Iraq during Operation Iraqi Freedom. These men and women made the ultimate sacrifice to our country. Your contribution will ensure that their children do not have to face this difficult emotional loss and bear a financial burden as well.

Daniel O'Dowd
Foundation President

<u>Danbury Hospital</u>

In 2004, Mr. Galante made a $250,000 commitment to Danbury Hospital to finance the construction of a new pediatric suite. One hundred and fifty thousand dollars has already been provided to the hospital and Mr. Galante fully intends to donate the remaining $100,000 after the disposition of this matter, when his assets are unfrozen. Dr. Patrick Broderick, Chairman of the Department of Emergency Medicine of Danbury Hospital, in a July 8, 2008 character reference letter[4] he wrote on Mr. Galante's behalf, described the pediatric suite:

The Galante Pediatric Suite is a separate 4-roomed patient care area in the Danbury Hospital Emergency Department designed specifically as a pediatric treatment area with special amenities intended to cater to the needs of the pediatric population and their families. The amenities include customized designs in each of the four rooms with state of the art audiovisual technology for children to enjoy in a private area

---

[4] All character reference letters have been forwarded under separate cover to the Court for its review.

◇

12

while undergoing evaluation and treatment.  The Galante Pediatric Suite provides a private area for patients and their families, a pediatric-friendly design to improve patient and staff satisfaction, and an opportunity to limit the pediatric population's exposure to the day-to-day activities in the main ED.

American Red Cross

In, 2001, Mr. Galante personally donated $50,000 to the American Red Cross in response to the tragic events of September 11, 2001.  Mr. Galante also donated an additional $50,000 through AWD.[5]

St. Edward the Confessor Parish

Mr. Galante has donated $500,000 to St. Edward the Confessor Parish Church Development Fund since 2001.  In addition, he helped finance the parish's work camp program, which gives young teens the opportunity to travel to Appalachia to rebuild the homes of families suffering severe financial hardships.

New Fairfield Fire Department

Mr. Galante donated approximately $30,000 to the New Fairfield Fire Department in 2003.  Those donations were used to purchase much needed equipment.

---

[5] A newspaper article detailing Mr. Galante's donation to the American Red Cross is contained in Attachment 3.

Bobby Forlastro

Bobby Forlastro was killed in 2004 in a work-related accident while working at AWD. In their character reference letter to the Court, Bobby Forlastro's parents explain how Mr. Galante helped them get through this difficult time:

> In December of 2004, a terrible accident occurred while Bobby was working, and we lost our son. Jim [Galante] took the time himself and called us to tell us the terrible news. He would call us many times, day and night to see how we were doing. It was clear that Jim held himself responsible for the death of our son because he had hired him. Of course it was not his fault; it was a tragic accident. We were so grateful to Jim for giving our son a chance to pursue his dreams, being his mentor and making the last few months of his life so positive with direction.
>
> Jim once again showed his unfailing kindness by covering the costs of the entire funeral, and the gathering at a local restaurant after the services. We really do not know what we would have done without Jim' caring ways during this difficult time. Jim would regularly call to see how we were doing, sending us gift baskets flowers, etc. on our birthdays and holidays, once again making us feel like we were family.
>
> In closing, we want to express our gratitude of Jim Galante. Many things have been said of him in the past two years of a negative nature. As you can see, Jim is a man of great compassion, kindness and consideration. He has put so many before himself, and he has used his position in the community to make it a better place....

Tory Hudson

Tory Hudson was tragically killed in a car accident on the night of her Senior Prom in 1996. Mr. Galante, who never met Tory Hudson or her family, anonymously paid for the entire

funeral after hearing about the tragic accident and the Hudson's financial difficulties. In fact, only recently did Tory Hudson's mother, Gloria Hudson, learn that it was the Mr. Galante who paid for the funeral. To this day, Gloria Hudson still appreciates Mr. Galante's act of generosity. In her character reference letter dated June 16, 2008, she writes:

> Because the Galante family gave something to my family that was so precious and so unselfish... I will never be able to repay them for their kindness.
>
> And so I can say, in all confidence that Jim Galante is a good man, a good Christian, a giving, loving and unselfish person.

The examples above are just some of the more poignant illustrations of the Galantes' generosity. The Galantes' good deeds were too often and far-reaching to be fully recounted here. And while there are certainly those who may discredit James Galante's generosity because his ability to be as benevolent as he has been arose in part from some of the criminal activity that brings him before the court now, it is important to remember that Mr. Galante made these contributions not because he had to, but because he wanted to. He often did so anonymously and without solicitation. When asked why, he contemplatively responds that he remembers what it was like to have nothing.

### 2. Criminal History

On April 13, 1999, Mr. Galante pled guilty to Aiding and Assisting in the Preparation and Presentation of a False 1991 U.S. Corporation Tax Return, in violation of Title 26 U.S.C. §

7206(2).   Mr. Galante also has charges pending in Connecticut State Court for alleged violations of campaign finance regulations.

### C.     Need For The Sentence Imposed

As noted above, in addition to the nature of the offense and the characteristics and history of the defendant, subsection (2) of section 3553(a) also directs the court to consider whether the sentence to be imposed reflects the seriousness of the offense and provides just punishment for the offense; affords adequate deterrence to criminal conduct; protects the public from further crimes and provides the defendant with appropriate educational, vocational, medical or correctional treatment in the most effective manner.

On behalf of Mr. Galante, we respectfully submit that a sentence within the range agreed upon by the government and the defendant adequately satisfies each of these statutory concerns. Indeed, we respectfully suggest that a sentence at the bottom of that range would accomplish the stated statutory goals.

1.     A Sentence at the Bottom of the Sentencing Range Reflects the Seriousness
of the Offense and Provides Just Punishment

The offenses to which Mr. Galante stands convicted are racketeering conspiracy, conspiracy to commit wire fraud and conspiracy to defraud the Internal Revenue Service.   Mr.

Galante understands the seriousness of these offenses and the significance of his involvement in them. He takes full responsibility for his behavior.

Mr. Galante is fifty-five years old. Therefore, even if the Court sentenced him to the very bottom of the sentencing range, Mr. Galante would be sixty-one years old when he is released from prison. In addition, he has been confined to his home in New Fairfield since June 30, 2006.[6] While we are not asking the Court to give Mr. Galante credit for the period in which he was confined to his home as "time served," we do believe this is a factor the Court should bear in mind and allow consideration for that 26-month period of confinement when imposing sentence.

Though home confinement is not the equivalent of incarceration, it should be recognized that Mr. Galante has not spent the last two years a free man. His liberty was drastically curtailed in a considerable number of ways. As an initial matter, he was prevented from working to support his family. Moreover, the extensive "no-contact list" applicable to Mr. Galante included many of his friends, co-workers and even a family member. Due in large part to publicity surrounding the case, the no-contact list was misinterpreted by the public at large in such a way to deter even those not on the list from having contact with Mr. Galante.

Mr. Galante was additionally prevented from having a cell phone in his house,

---

[6] There were certain exceptions to Mr. Galante's confinement of which this Court is aware.

17

whether in his or anyone else's possession.  Nor was he permitted to have access to a computer,

the Internet, caller-ID, or call forwarding.  In addition, a Penn Register was placed on his home

telephone to monitor all calls coming in and out of his home.  He was further constrained from

travelling more than 15 to 20 feet beyond his front door.

Accordingly, the defendant respectfully requests that the Court take these deprivations of

liberty into account in determining a sentence that is sufficient but not greater than necessary to

meet the ends of justice.

2. A Sentence at the Bottom of the Sentencing Range Affords Adequate Deterrence to
Criminal Conduct and Protects the Public from Further Crimes

Fortunately for Mr. Galante, and unlike many of the other individuals who come before

this Court, he expects to be financially secure when he is released from prison.  That fact alone

eliminates one of the primary forces that often drive individuals back into a life of crime upon

release from prison.

In addition, and as part of his plea agreement, Mr. Galante forfeited all of his interests in

the companies named in the indictment and agreed to withdraw from the trash industry as a

whole.  Mr. Galante's disassociation with that industry lends itself to the probability that he will

not again become caught up in the same behavior that has brought him before this Court.

D. <u>Designation</u>

Mr. Galante respectfully requests that the Court recommend to the Bureau of Prisons that he be designated to the Allenwood Federal Correction Facility in Pennsylvania. Under current Board of Prisons protocol, Mr. Galante will likely fall within the "minimum" designation range. FCI Allenwood is located approximately 4 hours by car from the Galantes' home and will therefore allow Mr. Galante's family to visit him. In addition, due to Roseanne Galante's health concerns, distance is a significant consideration. Accordingly, it is respectfully requested that this Court recommend to the Bureau of Prisons that Mr. Galante be designated to FCI Allenwood Low.

E. <u>Self-Surrender</u>

Mr. Galante also respectfully requests that he be permitted to self-surrender following imposition of sentence.

**IV. Conclusion**

Based on the foregoing, the defendant respectfully submits that a sentence at the bottom of the sentencing range is a sentence that would be sufficient, but not greater than necessary, to accomplish the objections of 18 U.S.C. § 3553(a).

THE DEFENDANT
JAMES GALANTE


BY: _____

       HUGH F. KEEFE, ESQ.
       Federal Bar No. ct05106
       NICOLE FOURNIER GELSTON, ESQ.
       Federal Bar No. ct18550
       Lynch, Traub, Keefe, & Errante
       52 Trumbull Street
       New Haven, CT 06510
       Tel.: (203) 787-0275
       Fax.: (203 782-0278

## CERTIFICATE OF SERVICE

I hereby certify that on August 21, 2008 a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____
Hugh F. Keefe  (ct05106)
Lynch, Traub, Keefe, & Errante
E-mail: hkeefe@ltke.com