# UNITED STATES DISTRICT COURT

## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **Criminal No. 3:06cr161(EBB)** |
| | : | |
| **v.** | : | |
| | : | |
| **JAMES GALANTE** | : | **September 2, 2008** |

## UNITED STATES' MEMORANDUM IN AID OF SENTENCING

On June 3, 2008, James Galante pleaded guilty to the three separate conspiracy charges that form the cornerstone of the government's case: (1) the racketeering conspiracy charged in Count 2; (2) the wire fraud conspiracy charged in Count 75; and (3) the conspiracy to defraud the Internal Revenue Service (*Klein* conspiracy) charged in Count 81. The defendant has also agreed to pay $1.6 million in back taxes and to forfeit: (1) his entire trash empire to the United States, which includes his ownership interests in 25 trash hauling companies; (2) $450,000 in cash seized from his business office and his home; (3) a separate residence located at 530 Main Street North, Southbury, Connecticut and adjoining parcels of land; (4) six racing cars; and (5) a Featherlite Trailer used to haul the racing cars. He also agreed to withdraw from the carting industry. Moreover, Galante has stipulated that the United States Sentencing Guidelines suggest a sentence of between 70 and 87 months of imprisonment and a fine range of $10,000 to $100,000. Citing his philanthropic history, but ignoring the many other pertinent sentencing factors that should guide the Court in this case, Galante seeks a sentence of 70 months. For the reasons that follow, the United States submits that the defendant should be sentenced to 87 months of imprisonment, which is the high end of the stipulated range, and fined $100,000.

I.    Background:  The Three Conspiracies

In mid-2003 law enforcement officials began an investigation into organized crime's infiltration and control of Connecticut's trash industry.  The investigation revealed that a central group of companies operated by James Galante and his silent partner Thomas Milo formed the core of the enterprise.  Galante controlled more than 25 trash hauling and related companies.  Nearly all were headquartered on the site of Galante's trash transfer station, 307 White Street, Danbury, Connecticut.  Galante also owned a minor league hockey team, the Danbury Trashers, as well as a race car team, Mystique Racing.  The investigation also revealed that Galante did not act alone; several family-owned companies in Connecticut and eastern New York also participated in a scheme to fraudulently eliminate competition and fair pricing for garbage collection services ("property rights system").[1]  But it remains clear that Galante was at the center of the scheme, constantly looking to expand his control over the market.

The wide sweeping investigation initially utilized an undercover agent ("UC") who posed as a rogue salesman for a large, national waste hauler.  The UC quickly established a corrupt business relationship with Galante's lead salesman, Richard Galietti.[2]  In August 2004, this Court authorized the government to wiretap Galietti's telephone conversations.  Within a few months, the telephone conversations of James Galante and his principal associates, Ciro Viento and Richard

_____

[1]  In this regard, several principals and employees of non-Galante companies including Joseph LoStocco, Gary Mueller, Alan Ferraro, David Magel, Anthony Novella, Dennis Bozzuto, Jeremy Everett, Scott McGowan, J.R. LoStocco, AJ Wallinger, Jason Manafort and Phil Armetta have pleaded guilty to various federal charges.

[2]  This Court recently sentenced Galietti, a first time offender, to the high end of his advisory Guidelines range:  46 months of imprisonment.

Caccavale,[3] were also being intercepted pursuant to court order.  The wiretap investigation continued for the next eleven months with ten telephones being monitored.  The wiretap evidence, which included over 50,000 intercepts, proved devastating to the defendants, as the recorded conversations revealed that illegal dealings between trash haulers were commonplace.

In July 2005, federal law enforcement agents executed over forty search warrants in Connecticut and New York and seized more than $500,000 in cash and over 5,000 boxes of documents.

A year-long grand jury investigation followed.  In June 2006 a federal grand jury sitting in New Haven indicted twenty-nine individuals and ten corporate defendants, charging the vast majority with racketeering, racketeering conspiracy, mail and wire fraud, obstruction of justice and tax violations.[4]  The three overarching conspiracies to which Galante has pleaded guilty are outlined below.

A.      The Racketeering Conspiracy

In a nutshell, this prosecution has revealed that for several decades the defendants operated a fraudulent scheme – known as the "property rights system" – to eliminate competition for garbage collection services.  The property rights system is based on the rule that a customer or account ("a stop") stays with a participating trash hauler forever because other participating companies will not honestly compete for that customer's business, opting instead to refrain from soliciting that customer

---

[3]  Caccavale and Viento, like Galietti, had no convictions prior to the instant prosecution. This Court has sentenced both men to 30 months of imprisonment, which was at the middle of their advisory Guidelines range.

[4]  Additional defendants were charged in a separate indictment.  A superseding indictment followed in June 2007, adding kidnaping and arson predicates to the racketeering conspiracy.

or, when asked to provide a bid or price quote, intentionally submitting prices above those of the current service provider.  Carters that do not abide by the property rights system are branded "renegades" or "outlaws" and are subjected to threats, intimidation, and acts of vandalism in order to force them from the marketplace or into compliance.

This prosecution has developed powerful evidence of the cartel's day-to-day price fixing activities, and of its strong-arm tactics taken against any genuine price competitors.  Numerous incidents of bid-rigging were documented.  For example, whenever a dissatisfied customer tried to solicit bids from other companies, the cartel would arrange for all other bids to exceed the "assigned" company's bid.  Other cartel members would pretend to be independent companies, genuinely competing for business -- but the price quotes they offered the customer were always higher than the assigned company's price.  The wiretap also exposed Galante's response to various trash hauling companies that had the nerve to solicit his customers.  In essence, the defendant and his associates would orchestrate a comprehensive counter-attack, which included:  colluding to take away the competing company's customers with predatorily low bids; damaging the competitor's property; attempting to work with local, "friendly" police contacts to have the outlaw company's trucks stopped and harassed; arranging to have the outlaw company denied access to certain trash transfer stations needed to stay in business; and, when one "outlaw" company was defeated and sold out to the cartel, boasting in several phone calls about how the customers would now pay much higher prices.

The investigation also disclosed certain managers at Galante's trash conglomerate discussing acts of violence being planned against individuals who they believed had crossed or betrayed them.

On several occasions the law enforcement officials had to intervene deftly to stop physical violence against individuals but simultaneously preserve the integrity of the lengthy investigation.

This prosecution also exposed the links between Galante and members of the Genovese Organized Crime Family, including Thomas Milo and Matty "the Horse" Ianniello, who was the boss of the family. A search of Galante's office uncovered a ledger showing that he was paying over $100,000 a year in "tribute" to Ianniello through Milo. The information in the ledger was corroborated by witnesses directly involved.[5]

The investigation also exposed Galante's willingness to commit violence against a citizen at the request of a high-ranking state politician whose legislative responsibilities possibly included oversight of the trash industry. As on other occasions during the investigation, law enforcement was able to intercede in a timely manner to stop any violence before it occurred.

The investigation also revealed Galante's involvement in the burning of a competitor's truck in the early 1990s as a means of sending a message to potential competitors to "stay out of Connecticut."

**B.    The Tax Conspiracy**

In addition to the racketeering conspiracy, Galante was also deeply involved in a long-term, ongoing conspiracy to defraud the Internal Revenue Service. Specifically, the IRS developed evidence that Galante and his associates devised a multi-object scheme to hide substantial assets from the IRS. This conspiracy benefitted both the companies owned by Galante as well as provided

---

[5]   In May 2007, this Court sentenced Ianniello, who was 86 years old and in failing health, to 24 months of imprisonment. As part of his guilty plea, Ianniello acknowledged taking the payments.

personal financial benefits to many of the individual participants.   The objects of the *Klein* conspiracy included:

- placing numerous "no show" employees on the payrolls of various trash companies, when in fact these individuals provided no services to the trash companies.  These "no show" employees included a close, intimate friend of Galante, members of Galante's racing team, an associate of the Genovese crime family, members of Galante's hockey team, Galante's family members, and relatives of Thomas Milo.  The companies who paid these "no show" employees treated the salary and benefits paid to the employee as a deductible expense;

- falsifying business expenses, including but not limited to fabricating expenses for maps, fuel, manual labor by undocumented workers, firewood, gravel, tolls, and truck washes.  The IRS estimates that, over the last five years, Galante directed his employees to falsify over $337,000 worth of expenses;

- improperly claiming certain items as business expenses, including but not limited to tires, engines and other parts used to maintain Galante's racing cars.  The IRS estimates that, over the last five years, Galante claimed over $200,000 in expenses related to the operation of his race cars;

- establishing a shell company to provide Lisa Henry[6] with a house and riding stable.  The only asset owned by the company, 530 Main Street North, was a house occupied by Lisa Henry. One of Galante's trash companies pays the mortgage through the shell company, which takes deductions for "upkeep," in the form of utilities, acquisitions of large ticket electronic items such a large screen television, hay, and landscaping;

- skimming a portion of the cash proceeds generated by various aspects of Galante's trash operations, including not reporting as income cash derived from individual residents who dumped refuse at the transfer station located at 307 White Street, requested the disposal of bulk items, or rented roll off containers;

- inducing two employees to "kick back" a portion of their salaries to Galante in cash.  Galante provided two employees with multiple paychecks.  One check was  the employees's regular salary, but the other check was kicked back to Galante in cash every week by the employees. Galante failed to report any of this cash as income to the IRS.  The IRS has established that approximately $725,000 in cash was provided to Galante in unmarked envelopes over a four year period; and

---

[6] This Court sentenced Lisa Henry, a first time offender, to three months of imprisonment following her conviction of structuring and tax charges.

■ providing tribute/protection payments to Matty "The Horse" Ianniello.  As noted above, the investigation has established that Galante paid $30,000 on a quarterly basis to Ianniello, a high ranking member of the Genovese crime family.  Ianniello failed to report this income to the IRS.

Critically, *this in not Galante's first federal tax conviction*.  As the Court knows, the Honorable Janet C. Hall sentenced the defendant to twelve months and one day of imprisonment for Filing a False Tax Return.  *See* PSR at ¶ 245.

### C.     The Wire Fraud Conspiracy against the UHL

In 2004, Galante purchased the Danbury Trashers, a minor league hockey team that played in the United Hockey League (UHL).  The government's investigation established that Galante and his associates defrauded the UHL of fines that would have potentially been levied as a result of the Trashers' violation of the UHL salary cap rule during the 2004-2005 season.

The UHL was a minor league professional hockey league headquartered in Lake St. Louis, Missouri.  In 2004, the league was composed of fourteen teams, called member clubs, located in Connecticut, New York, Virginia, Michigan, Illinois, Indiana, and Missouri.  The teams were organized into three divisions, the Eastern Division, Central Division, and Western Division, and played approximately 76 league games in the 2004-2005 season.

The UHL salary cap, which was approximately $275,000 for the 2004-2005 season, was included in the UHL Rules and Regulations.  These regulations provided for specific penalties for teams that violate the salary cap, including a luxury tax, other monetary fines, and the possible forfeiture of games.  One portion of the relevant section of the regulations states that "[u]pon finding by the League Office that a Member Club has exceeded the yearly salary cap, said Member Club

shall remit to the League Office two dollars for every dollar over said cap, payable upon demand by the League Office." Multiple teams were fined in the past for violations of this salary cap provision.

The UHL rules required each Member Club to report their salary cap expenditures on a weekly basis to the league. During the 2004-2005 season, the Danbury Trashers faxed these reports from Connecticut to Missouri every week. The reports were signed by either the team coach and manager. These reports, which fraudulently omitted the salaries paid to players through no show jobs and other sources, indicated that the Trashers were within the salary cap.

In the 2004-05 season, the Trashers' payroll was approximately $750,000, almost three times the UHL salary cap. By paying such salaries, the Trashers were able to sign the league's highest scorer, the number one goalie, and the "best fighter." In sum, the Danbury Trashers wired numerous salary cap reports that contained material falsehoods to the UHL that under-reported the salaries paid to the players by approximately $475,000.

## II.    **87 Months of Imprisonment:  A Fair, Just and Reasonable Sentence**

When considering what sentence to impose, courts are instructed to consider, among other things:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant; [and]

(2) the need for the sentence imposed –

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct; [and]

(C) to protect the public from further crimes of the defendant[.]

*See* 18 U.S.C. § 3553(a).  These factors are addressed below.

-8-

### A.    The Nature of the Offenses

**Racketeering**:   A racketeering conspiracy, by its very nature, constitutes a very serious federal offenses because unlike other crime, the crime *requires* an enterprise.  That is, a defendant's conduct only becomes criminal when he knowingly associates with a larger group or pack of criminals who have united to cheat, steal, extort, or otherwise victimize citizens.  Successful enterprises rely on cohesion and coordination.  But given the human dynamic, the goal of unity must sometimes be attained through violence and the threat of violence.  A second, equally pernicious aspect of racketeering is that the enterprise model, by design, shields the most culpable leaders from exposure to the law while sacrificing the less sophisticated participants to the judicial system.

**Tax Conspiracy:**  Our tax system is driven by the honesty of those citizens and corporations who pay their fair share.  Unfortunately, some citizens opt for a different path, knowingly cheating their fellow citizens by engaging in a host of schemes to under report income or over claim deductions.  When a tax cheat is caught, the message must be sent that such conduct cannot be excused.  Otherwise, others "on the fence" will be emboldened to proceed in a similarly dishonest fashion.  Accordingly, violation of our tax laws constitutes a very serious offense.

**UHL Wire Fraud**:  Frankly, this crime is interrelated with the tax offense and , by itself, does not rise to the same level of seriousness as the racketeering and tax conspiracies at bar.

### B.    The Circumstances of the RICO and Tax Offenses

**The Racketeering Conspiracy**:  In the past four years, this Court has supervised an eleven month wiretap, authorized scores of search warrants, reviewed numerous pretrial motions, conducted several evidentiary hearings, accepted over thirty guilty pleas, and imposed dozens of sentences.  It is doubtful that any court could be more familiar with and have a better grasp of a case than this

-9-

Court does in the matter at hand.  As a result, the Court has consistently admonished dozens of defendants in this case that the instant racketeering offense is an extremely serious offense.  The conspiracy was long-lived, extensive, predicated on arson and other acts of violence, threats of violence, economic extortion, fraud, bribery and witness tampering.  It was a thoroughly corrupting operation.

Simply put, the enterprise in this case was built around James Galante.  Until this prosecution, James Galante was the undisputed and unchecked organizer, leader and master of an incredibly powerful, sweeping and controlling trash dynasty.  For nearly two decades, Galante's enterprise promoted a climate of fear through violence, threats of violence, economic sanctions and threats of economic sanctions.  For instance, Galante and a few trusted associates burned a competitor's truck in 1992 – after first binding the driver – to send a message to stay out of the Connecticut market, and in 2006, damaged the tires of a competitor's truck after that carter refused to back down on a $50/month account.  *See* PSR at ¶¶ 28-52; 195-203.

In addition to creating and maintaining an aura of violence, under Galante's direction and control, his core group of employees regularly denied non-participating carters access to transfer stations.  *See* PSR at ¶¶ 53-74.

Galante's employees also resorted to less threatening but every bit as illegal techniques to control the carting market.  They defrauded consumers by using multiple business cards and posing as competing salespersons, when in fact these persons were all affiliated within the same corporate structure and privy to the price quotes being made to the unwary consumer.  His employees also assumed the identity of a salesperson from another company, with that company's authorization and consent, and quoted excessively deflated market prices to customers then being serviced by a carter

-10-

not participating in the property rights system.  Similarly, Galante and his employees fraudulently claimed increased disposal site costs in order to impose bogus price increases under the terms of customer's service contracts.  *See* PSR at ¶¶ 75-108; 120-137; and 204-212.

At bottom, Galante's enterprise acted to squelch competition and deceive customers into believing that they had access to a competitive market when in point of fact, the enterprise strove to artificially control prices, inflate prices, and leave customers with no choice but to pay inflated prices.

As the evidence also shows, Galante is corrupt and corrupting.  Members of the enterprise and their associates bribed and attempted to bribe or otherwise induce law enforcement officials to: run license plate registrations to determine whether competing carters were cooperating with law enforcement; access restricted police computer databases to ascertain whether the enterprise, its members or associates were being investigated by law enforcement; determine whether a certain individual was actually an undercover law enforcement officer; and otherwise abuse their lawful authority by stopping the trucks of competing carters and by issuing motor vehicle infractions.  *See* PSR at ¶¶ 138-161.  Galante and his trusted associates also tampered with witnesses summoned to appear before a federal grand jury to prevent those witnesses from providing truthful and complete testimony.  *See* PSR at ¶¶ 214-217.  And when a prominent state politician confided in Galante about a personal problem, Galante offered – by writing on a piece of paper so as to not be overheard – to have an individual paid "a visit."

**Tax Conspiracy**:  The circumstances of the tax conspiracy are equally troubling in this case. The defendant was released from federal prison on or about  September 1, 2000.   This period of

-11-

incarceration did nothing to deter the defendant as he and his co-conspirators immediately began to implement another scheme to defraud the IRS.[7]

The scope of this new scheme was immense, far exceeding the conduct that formed the basis for Galante's original conviction.   The defendant and his accountant employed sophisticated techniques to cheat the IRS even though he previously was imprisoned for tax fraud.  Rather than learn his lesson, the defendant returned to his trash empire and picked up right where he left off. Using no-show employees, Galante funneled thousands of dollars in corporate money to a chosen group of individuals who were doing nothing for his companies.  The companies that paid these no show employees then treated the salaries and benefits as deductible expenses.   In addition, by falsifying business expenses for items such as maps, fuel, firewood, tolls and truck washes in the five years prior to the indictment, Galante cheated the IRS over $300,000.  He similarly claimed over $200,000 in garbage company business expenses that were more properly allocated to the operation of his race car hobby.   Another scheme to defraud the IRS involved the establishment of a shell company to provide another individual with a house and riding stable.   One of Galante's trash companies paid the mortgage through the shell company, which in turn deducted "upkeep" expenses for items such as a large screen television, hay and landscaping.  Galante also routinely skimmed cash from his companies and, moreover, had two employees kick back portions of their salaries to him.   The IRS has determined that over $700,000 in cash was provided to Galante in unmarked envelopes over a four year period.

---

[7]   Count 81, to which the defendant has pleaded guilty, charges that the conspiracy to defraud the IRS ran from September 2, 2000 (the day after Galante was released) to April 15, 2005.

### C.      The Nature and Circumstances of the Offenses:  Conclusion

When the breadth of the racketeering conspiracy is digested and the damage it has caused assessed, a sentence at the high end of the advisory range is plainly warranted.  When one considers the enormous tax fraud at bar, especially given that the defendant has previously been convicted and jailed for a federal tax violation, a jail sentence of 87 months is mandated.

### D.      The History and Characteristics of the Defendant

Many of the jail sentences the Court has imposed in this case have come after sentencing hearings that could aptly be characterized as testimonials for the given defendant – businessmen who have given generously to their communities; strong family men who have raised good kids.  Upon review of the defendant's sentencing memorandum, which catalogues his munificence, it appears that this sentencing proceeding will mirror many of the others.  The United States respectfully submits that as in the other cases, there are two sides to this defendant as well.

FIRST:  The defendant is a bully.  The Court need look only to the video taped meeting between Galante and a representative of Copes Refuse, where the defendant screamed menacingly at a rival carter and poked him in the chest.  *See* PSR at ¶ 115.  Or, to replay of the May 2006 conversations between Galante and his minions – Caccavale, Galietti and Viento – as he coordinated, encouraged, and approved of the extortion of J.R. LoStocco, at one point musing that Caccavale was doing such a good job of pressuring LoStocco that he might have a breakdown and end up in the hospital.  *See* PSR at ¶¶ 28-52.

Galante was able to play the bully for three reasons:  first, he controlled the market and local transfer station and could, accordingly, impose economic sanctions on others; second, he fostered the reputation of being connected to the mob; and third, he actually did resort to violence on

occasion.  For instance, in May 1992 he participated in the burning of a rival's truck in order to "send a message" to stay out of Connecticut.  *See* PSR at ¶¶ 195-203.  And in 2005, after his lead salesman had punched out his accountant, Galante dispatched Richard Caccavale to hire "The Carpenter" to install "cabinets" in Galietti's house.  *See* PSR at ¶¶ 162-179.

SECOND: The defendant is corrupting.  The trail of devastation left in Galante's wake is staggering.  As revealed by the wiretap, Galante was a hands-on manager, intimately involved with every aspect of his business operation.  He met with his inner-circle every morning in the paint shop; he reviewed every "daily report" submitted by his sales force, often writing notes in the margin; and he spoke to his trusted associates several times a day by telephone and in person to monitor even the smallest of details.  As such, Galante cultivated a culture of criminality at AWD.  His inner-circle of associates, Christopher Rayner, Richard Galietti, Ciro Viento, and Richard Caccavale, did not have criminal records until going to work for Galante.  Similarly, when he became aware of the government's investigation following the search warrants in the summer of 2005, Galante actively sought to pervert justice by dispatching Eric Romandi to meet with a former employee to coach that individual's testimony before the grand jury.  *See* PSR at ¶¶ 214-217.

THIRD:  The defendant's generosity has been funded by ill-gotten gain and, accordingly, does not justify a sentence at the low end of the advisory Guidelines range.

While the government recognizes that the defendant and his wife have donated significantly to worthy causes over the past several years, the reality remains that the defendant was simply buying legitimacy with his racketeering proceeds.  It is notable that the bulk of defendant's "charity" comes as the result of simply writing a check, not by his direct participation in the work of the charity.  Further, it is curious that the defendant would so strongly urge this Court to reduce his sentence on

this basis when the donations were merely the fruits of the racketeering organization.  It should be clear – the reason the defendant and his wife were able to donate money to various charities is because Galante defrauded and overcharged the businesses who were forced to utilize his trash hauling services.  It is the customers who should receive the credit for the donations, not James Galante.

Thus, notwithstanding the defendant's charitable history, he is not a poster boy for generosity. Instead, he is the head of a large scale racketeering enterprise that thrived on violence, the threat of violence, intimidation, the imposition of economic sanctions, fraud and obstruction of justice.  The defendant rose to his high level by corrupting those around him and bullying those who did not buy into his program.  As such, an 87 month sentence is an appropriate result.

### E.      The Need to Reflect the Seriousness of the Offenses

This Court has repeatedly emphasized that the racketeering conspiracy at bar is an extremely serious offense, warranting imprisonment for even those tangentially involved.  Galante, of course, headed the enterprise and was the driving force behind everything it involved.  Compounding Galante's culpability, and separating him from many of his co-defendants, is his involvement in the tax fraud, which he concedes is between $400,000 and $1,000,000.  Together, these convictions coalesce into a profile of criminality for this defendant that is pervasive and can only addressed by a sentence at the high end of the advisory Guidelines range.

### F.      The Need to Promote Respect for the Law

On September 15, 1999, James Galante was sentenced to a term of imprisonment of one year and one day, and fined $100,000, after having been convicted in the District of Connecticut for aiding in the preparation and presentation of a false 1991 U.S. tax return.  As noted above, he was

released on or about September 1, 2000.  On June 3, 2004, Galante met with the Undercover Agent in his office and commented about that experience, characterizing the conviction and sentence as a minor "speed bump."[8]  Given the defendant's quick and complete return to criminality following his release from federal prison, it is clear that the defendant's comment was not idle puffing; he meant what he said.  Accordingly, promoting respect for the law is especially important here.

### G.    The Need to Provide Just Punishment

An 87 month jail term aptly reflects this defendant's culpability and will not be so skewed from the other sentences imposed in this case as to constitute an injustice.  In fact, it is a sentence much lower than that recommended by the Probation Officer.  At the end of the day, an 87 month term of incarceration is an appropriate disposition for a man freshly convicted of three conspiracies after having been incarcerated previously in federal prison for tax fraud.  Galante headed an incredibly successful criminal enterprise.  But unlike his coconspirators who participated in the operation, Galante profited vastly, amassing a fortune and enjoying a lavish lifestyle.  *See* PSR at ¶ 256.

### H.    The Goal of Deterrence

The defendant submits that his significant forfeiture and agreement to withdraw from the carting industry satisfies the need for specific deterrence.  The facts of this case reveal otherwise. At bottom, James Galante is a criminal.  The inability to follow the law, or perhaps the attitude that the laws do not apply to him, permeates everything Galante does.  When it comes to operating his businesses, interacting with people, or pursuing his hobbies, Galante is dishonest and manipulative.

---

[8]  Specifically, Galante remarked that no one has been able to slow me down, with the exception of the U.S. Government, and even that was just a speed bump.

His actions in this case plainly reveal that his prior term of incarceration did nothing to deter him from escalating his criminal activity.  As such, unlike many of the defendants already sentenced by the Court, specific deterrence is an important consideration.

Further, putting aside that a prior term of federal incarceration did not blunt Galante's appetite for the criminal life, the defendant's argument utterly ignores the need for the sentence in this case to serve the paramount goal of general deterrence.  If this prosecution accomplishes nothing else, it must stand as a warning to those carters who are tempted to perpetuate or reinvigorate a property rights system in their market.  An 87 month term of incarceration for the veritable king pin will satisfy the goal of general deterrence in that it will starkly warn others who might be tempted to step into a similar role.

## III.   <u>Conclusion</u>

James Galante headed an extensive organization that constantly sought to crush competition in the garbage industry while falsely promoting the impression of actual competition.  To accomplish this goal, the defendant initially employed violence and, having solidified his reputation, threats of violence, to bring area carters into line.  He was able to use his enterprise to stifle other trash haulers. Bolstered by this control, the defendant's enterprise was able to unilaterally impose price hikes for carting services.

Galante also perpetrated an air of legitimacy, maintaining contacts with local and state politicians and donating to charities.   Through the use of these techniques, the defendant transformed a small garbage company into a multi-million dollar money making machine.  He then spent the considerable profits generated by the racketeering enterprise on personal indulgences, such as extra houses, a hockey team, luxury sports cars and racing cars.  He did not pay sufficient taxes,

-17-

however, choosing instead to defraud the IRS even after having been convicted of similar activity in 1999.  Rather than pay the IRS, he paid taxes in the form of quarterly "tribute" payments to Matty "The Horse" Ianniello, head of the Genovese Organized Crime Family, for mob backing.

Against this backdrop, a term of 87 months' incarceration, coupled with an appropriate fine, is a just disposition to this matter as it will not be greater than necessary and will reflect the serious nature of the offenses of conviction, promote respect for the law and afford adequate deterrence to others who may be situated similarly and tempted to act as this defendant did.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY

/s/

MICHAEL J. GUSTAFSON
FEDERAL BAR NO.  ct 01503
ASSISTANT UNITED STATES ATTORNEY
450 MAIN STREET
HARTFORD, CONNECTICUT 06103

/s/

RAYMOND F. MILLER
FEDERAL BAR NO. ct 20451
ASSISTANT UNITED STATES ATTORNEY
157 CHURCH STREET
NEW HAVEN, CONNECTICUT 06510

## __Certification__

I hereby certify that on September 2, 2008, a copy of foregoing Memorandum in Aid of Sentencing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.  A copy of this Sentencing Memorandum was also emailed to USPO Ray Lopez.

/s/ Michael J. Gustafson
MICHAEL J. GUSTAFSON
ASSISTANT UNITED STATES ATTORNEY
450 MAIN STREET
HARTFORD, CONNECTICUT
FEDERAL BAR NO. CT 01503
PHONE: (860) 760-7960
FAX: (860) 760-7979
E-MAIL: MIKE.GUSTAFSON@USDOJ.GOV

/s/

_____
MICHAEL J. GUSTAFSON
ASSISTANT UNITED STATES ATTORNEY